FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ DEC 14 2016 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
BRENDA ESTRELLA-JONES,

                Plaintiff,

-against-

UNITED STATES OF AMERICA,

                Defendant.
------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
13-CV-5454 (CBA) (LB)

**AMON, United States District Judge:**

Plaintiff Brenda Estrella-Jones suffered a knee injury after tripping in the parking lot of a federal building in Brooklyn, New York on August 9, 2011. (See D.E. # 1 ("Compl.").) Estrella-Jones commenced this action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346 et seq., on October 1, 2013. (See id.) This Court has jurisdiction over this FTCA action under 28 U.S.C. §§ 1346(b) and 1402(b). On July 26 and 27, 2016, the Court held a bench trial on liability. (See D.E. # 53, 54.) Based on the trial evidence, the Court concludes that the United States is not liable for Estrella-Jones's injury.

## FINDINGS OF FACT

The Veterans Administration Harbor Healthcare System operates a hospital at 800 Poly Place in Brooklyn, New York (the "VA Hospital"). (See Tr. 208:12–15.) There is an asphalt parking lot outside the VA Hospital's main entrance. A raised gray concrete sidewalk separates the black asphalt parking lot from the main entrance, and a red-and-yellow-painted concrete curb separates that sidewalk from the parking lot. An approximately eighteen-inch concrete "apron" surrounds the concrete curb, separating the curb from the asphalt. (See generally Gov. Ex. A (photographs of accident location taken August 9, 2011); Gov. Ex. F (photographs of accident location taken in October 2013); Gov. Ex. G (photographs of accident location taken by

1

government witness C.J. Abraham on December 7, 2015); Pl. Ex. 8 (photographs of accident location taken by plaintiff's witness Nicholas Bellizzi on December 11, 2015).)

On August 9, 2011, Estrella-Jones drove her mother and father to the VA Hospital. (Tr. 19:2–10.) Estrella-Jones had been to the VA Hospital on prior occasions, sometimes using the main entrance. (Tr. 69:14–23.) On these prior occasions, she had not seen a hole in the VA Hospital parking lot. (Tr. 69:14–70:1.) On this particular occasion, Estrella-Jones was wearing flat open-toed summer sandals, fastened between the toe and by a strap around her ankle. (Tr. 28:15–32:1; see also Pl. Ex. 7 (photograph of plaintiff's sandal taken August 9, 2011); Pl. Ex. 13 (example of shoe plaintiff was wearing).)

At approximately 7:30 p.m., Estrella-Jones and her mother exited the VA Hospital by the main entrance. (Tr. 20:1–9; 57:1–9.) They walked toward the parking lot and Estrella-Jones's car, talking as they walked. (Tr. 20:1–15; 33:16–19; 57:4–11; 86:24–87:3.) Estrella-Jones's vision was not impaired and she was not distracted. (Tr. 63:11–15.) The parking lot was wet because it had rained earlier in the day. (Tr. 33:2–3; 61:25–62:7.)

After walking along the concrete sidewalk toward the parking lot, Estrella-Jones stepped with her left foot off the concrete curb onto the parking lot. (Tr. 24:3–25:8; 33:21–34:3; 54:25–55:7; 56:24–25.) She then stepped her right foot off the curb, while looking straight ahead. (Tr. 33:15–19; 64:3–65:17.) With her right foot on the ground, Estrella-Jones tripped and fell forward. (Tr. 24:3–25:7; 33:20–34:24; 57:9–58:9.) After falling, she looked back and noticed the condition of the pavement where she fell. (Tr. 46:2–22.)

The pavement where Estrella-Jones fell had the following characteristics.[1] In an approximately two-by-one-foot area adjacent to the concrete "apron," the parking-lot asphalt was worn. In some places, the top layer of asphalt had eroded away. Due to this erosion, there was a height differential between the concrete "apron" and the asphalt parking lot. At its deepest point, this height differential was at most seven-eighths of an inch. From that maximum differential, the worn asphalt sloped gradually upward over the distance of the approximately one-foot-wide area.

When Estrella-Jones fell, Israel Rodriguez was the police officer on duty at the VA Hospital. (Tr. 209:21–210:8.) While on duty, he routinely inspects the parking lot. (Tr. 224:18–23.) Prior to this incident, Officer Rodriguez had not seen the condition at issue in the 13 years he had worked at the VA Hospital. (Tr. 214:17–19; 260:9–261:2.) On the day of the accident, he spoke with Estrella-Jones in the VA Hospital emergency room. (Tr. 255:12–256:20.) Officer Rodriguez investigated the accident, including going to the scene. (Tr. 209:1–6; 257:20–259:12.)

---

[1] The condition of the pavement where Estrella-Jones tripped was much discussed at trial. Estrella-Jones described the width and the length of the relevant area as six inches and the depth as a half inch to an inch, but also stated she could not estimate its width. (Tr. 38:7–39:15; 65:21–69:13.) Officer Israel Rodriguez, who responded to the accident, called the area "worn," but testified he did not observe any unsafe conditions. (Tr. 214:12–21; 220:12–16; 259:10–12; 260:1–261:1.) Sam Fares, the Chief of the VA Hospital's Engineering Service, inspected the area in 2012 and did not observe a "hole" or any tripping hazard or unsafe conditions. (Tr. 271:14–272:14; 282:14–283:17; 287:18–289:3; 300:5–301:7.) Fares dragged his feet in the area and did not identify any parts of the asphalt that snagged or caught his foot. (Tr. 284:6–285:11.)

Two expert witnesses inspected the area in December 2015. Nicholas Bellizzi, a forensic engineering expert, measured an area of the parking lot approximately two feet wide and one foot long, in which he took vertical measurements that showed a height differential between the concrete apron and the parking-lot asphalt ranged from 7/8 to 1-1/4 inches. (Tr. 120:6–9; 121:17–20; 188:3–25.) Bellizzi testified that the difference in height between the concrete apron and the sloped asphalt portion of the parking lot was approximately seven-tenths or eight-tenths of an inch. (Tr. 119:2–18; 121:23–122:4; 124:18–125:8; 128:18–23; 135:19–136:4; 150:16–22; 166:7–167:10; 170:23–171:9.) Bellizzi stated that a defect in the asphalt parking lot was hard to see when walking and looking down at it. (Tr. 111:11–112:1; 170:21–22; 200:13–18.) Dr. C.J. Abraham, a safety engineering expert, found the area of the asphalt parking lot "essentially flat" and did not find any significant height differential in the area. (Tr. 346:6–12; 347:13–15, 17–23; 348:13–15; 351:22–353:11.)

Black-and-white photographs taken on the day of the accident, (Gov. Ex. A); color photographs taken in October 2013, (Gov. Ex. F); and color photographs taken in December 2015 by the expert witnesses, (Gov. Ex. G; Pl. Ex. 8), were also received into evidence.

Based on this evidence, the Court makes the above factual findings about the condition of the pavement on the day of the accident.

There had been no prior complaints about or incidents arising from the parking lot's condition. Officer Rodriguez had received no complaints in his 13 years at the VA Hospital. (Tr. 214:17–19; 260:9–261:2.) Sam Fares, the Chief of the VA Hospital's Engineering Service, knew of no prior reports or complaints of unsafe conditions in the area where Estrella-Jones fell, although approximately 300 people every day walk through that area. (Tr. 272:11–14; 278:6–14; 278:23–279:8; 281:21–282:25.)

## CONCLUSIONS OF LAW

Although the United States is generally entitled to sovereign immunity, it has waived immunity under the FTCA "for injury or loss of property, or personal injury or death[,] caused by the negligent or wrongful act or omission" of a federal employee in the scope of her employment. 28 U.S.C. § 1346(b). Liability under the FTCA is determined by the law of the place where the act or omission occurred. See id. § 1346(b)(1). Here, then, the substantive tort law of New York governs. See, e.g., Evans v. United States, 978 F. Supp. 2d 148, 165 (E.D.N.Y. 2013).

In order to establish negligence under New York law, a plaintiff must prove: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; and (3) the breach was a proximate cause of the injury to the plaintiff. See, e.g., Di Benedetto v. Pan Am World Servs., Inc., 359 F.3d 627, 630 (2d Cir. 2004); Irizarry v. Heller, 943 N.Y.S.2d 606, 607–08 (App. Div. 2012). Under New York law, a landowner owes a duty of reasonable care to those invited onto the premises. See, e.g., Greene v. Sibley, Lindsay & Curr Co., 257 N.Y. 190, 192 (1931). To prove that the United States breached this duty, Estrella-Jones must show that a dangerous condition existed and that the United States either created or had actual or constructive knowledge of the condition but failed to correct the condition within a reasonable time of acquiring such knowledge. See, e.g., Putnam v. Stout, 38 N.Y.2d 607, 612 (1976). She must then also prove that

the condition was the proximate cause of her injury. Id. Estrella-Jones must establish each element by a preponderance of the evidence. See, e.g., Wild v. Catholic Health Sys., 21 N.Y.3d 951, 955 (2013).

I.  **Dangerous or Defective Condition**

The first question is whether the condition of the VA Hospital parking lot was a "dangerous or defective condition" such that the United States could be liable for injuries the condition caused. The Court finds that it was not.

"[L]andowners and business proprietors have a duty to maintain their properties in a reasonably safe condition." Di Ponzio v. Riordan, 89 N.Y.2d 578, 582 (1997). To show that a landlord breached this duty, plaintiffs must show that a dangerous or defective condition existed on the property—that is, that the property was not reasonably safe. See Trincere v. Cty. of Suffolk, 90 N.Y.2d 976, 977 (1997).

Not all defects are unreasonable and therefore actionable. Some defects are trivial as a matter of law. See id., 90 N.Y.2d at 977; see also Santacruz v. Taco Bell of Am., LLC, 10 N.Y.S.3d 122, 123 (App. Div. 2015) ("However, property owners may not be held liable for trivial defects, not constituting a trap or nuisance, over which a pedestrian might merely stumble, stub his or her toes, or trip."). To perform the trivial-defect analysis, courts evaluate the "width, depth, elevation, irregularity and appearance of the defect along with the time, place and circumstances of the injury." Trincere, 90 N.Y.2d at 977; see also Czochanski v. Tishman Speyer Properties, Ltd., 45 F. App'x 45, 47 (2d Cir. 2002). Although "in some instances, the trivial nature of the defect may loom larger than another element . . . a mechanistic disposition of a case based exclusively on the dimension of the . . . defect is unacceptable." Trincere, 90 N.Y.2d at 977–78. Nevertheless, courts generally consider trivial "dangerous or defective condition[s] alleged by a pedestrian [with] a

height differential of approximately one inch." Natijehbashem v. United States, 828 F. Supp. 2d 499, 507 (E.D.N.Y. 2011) (collecting cases).

Whether a dangerous or defective condition existed is usually a question of fact. Trincere, 90 N.Y.2d at 977. The New York Court of Appeals has expressly stated that "whether a dangerous or defective condition exists on the property of another so as to create liability depends on the peculiar facts and circumstances of each case and is generally a question of fact for the [factfinder]." Id. For that reason, the Court declined to decide this issue on summary judgment when presented with conflicting information concerning the condition of the parking lot. (See Minute Entry & Order dated Nov. 18, 2015.)

Based on the Court's factual findings after trial, however, the Court now concludes that the condition of the parking lot was not dangerous and that any defect was trivial. First and foremost, a height differential of at most seven-eighths of an inch is not actionable in most circumstances. See Natijehbashem, 828 F. Supp. 2d at 507. The Court reached its finding concerning the height differential based largely on plaintiff's expert's testimony, which identified the deepest point in the depression as seven-eighths of an inch. This measurement was taken in 2015—over four years after the accident—and measured the height differential directly adjacent to the concrete "apron," a point at least six inches away from where Estrella-Jones tripped. Based on this height differential, Estrella-Jones fails to meet her burden to show that a defective condition existed.

Nor do the "width, . . . irregularity, and appearance of the defect along with the time, place, and circumstances of the injury" suggest a different result. Trincere, 90 N.Y.2d at 977. The worn pavement spread across a roughly two-by-one-foot area with sloping sides and no significant depressions or elevations. Nothing about the time, place, or circumstances of the accident makes this gradual depression in worn pavement unreasonably hazardous or dangerous. The pavement

was defective in the sense that it was worn and imperfect. But "property owners may not be held liable for trivial defects . . . over which a pedestrian might merely stumble, stub his or her toes, or trip." Santacruz, 10 N.Y.S.3d at 123; Czochanski, 45 F. App'x at 46–47. The fact that Estrella-Jones did trip and fall does not establish that the condition was hazardous, see, e.g., Lewis v. Metropolitan Transp. Auth., 472 N.Y.S.2d 368, 372 (N.Y. App. Div.) ("The mere happening of [an] accident does not establish liability on the part of the defendant."), aff'd, 64 N.Y.2d 670 (1984), and that is all that Estrella-Jones's evidence shows. Indeed, approximately 300 people per day traversed this area of the parking lot without any prior incidents. See Stein v. Trans World Airlines, Inc., 268 N.Y.S.2d 752, 753 (N.Y. App. Div. 1966) (finding evidence that numerous people traversed area without accident relevant to whether a given condition should be classified as dangerous); see also Santiago v. United Artists Commc'ns, Inc., 693 N.Y.S.2d 44, 45 (1999) ("[P]laintiff never established the existence of a dangerous condition, since, prior to her accident and despite the site being heavily trafficked, there were no complaints about the allegedly defective step . . . ."). Based on the evidence Estrella-Jones adduced at trial, the condition of the parking lot on the date of her accident was not dangerous and was, if anything, trivially defective.

Further, the condition of the parking lot did not have the qualities of a trap or snare. Even a trivial defect can bring about liability if it has the qualities of a trap or snare. See, e.g., Guerrieri v. Summa, 598 N.Y.S.2d 4, 5 (App. Div. 1993) (concluding that a condition "did not constitute an actionable defect or a dangerous condition" in part because it "possessed none of the characteristics of a trap or snare"); Santacruz, 10 N.Y.S.3d at 124 (same); see generally 85 N.Y. Jur. 2d Premises Liability § 33 (stating that a landowner has a duty "not to create or maintain on his or her property inherently dangerous traps or other hidden dangers of which a person foreseeably on the premises is entitled to be warned"). "Generally, a trap is an artificially created, inherently dangerous but

deceptively innocent instrumentality or condition. Its distinguishing characteristic, as compared to a mere defect in the premises, is that it is an inherently dangerous instrumentality with a deceptive appearance of safety that is deliberately created or constructed." 85 N.Y. Jur. 2d Premises Liability § 34; see also Mayer v. Temple Properties, 307 N.Y. 559, 563 (1954). Thus even "[a] condition that is ordinarily apparent to a person making reasonable use of his or her senses may be rendered a trap for the unwary where the condition is obscured or the plaintiff is distracted." Tesoriero v. Brinckerhoff Park, LLC, 5 N.Y.S.3d 261, 263 (App. Div. 2015) (quoting Oldham-Powers v. Longwood Cent. Sch. Dist., 997 N.Y.S.2d 687, 688 (App. Div. 2014)).

No evidence suggests that the worn pavement here was trap- or snare-like. It is manifestly unlike the paradigmatic trap or snare: Estrella-Jones does not claim that it was an artificial condition that the VA Hospital "deliberately created or constructed" to be dangerous but with a deceptive appearance of safety. It was a shallow depression in an open area. The condition was not obstructed, covered, or otherwise hidden. Although the area was used regularly, there is no evidence that it was so crowded as to obscure the condition to someone walking by. There were no factors—such as pooling rainwater or deficient lighting, see Tesoriero, 5 N.Y.S.3d at 261—that would have made the condition difficult to detect, see Argenio v. Metro. Transp. Auth., 716 N.Y.S.2d 657, 659 (App. Div. 2000). No credible evidence suggests the condition could have ensnared or entrapped a pedestrian. Insofar as Estrella-Jones testified that this occurred, (see Tr. 60:7–61:15), the Court does not credit it because it is contradicted by the credible evidence produced at trial concerning the condition's characteristics as well as Estrella-Jones's own testimony that it was only on looking back that she saw the condition that allegedly made her fall, (see Tr. 46:2–22). The trap exception, intended to prevent landowners from affirmatively

ensnaring trespassers with apparently safe but secretly dangerous conditions, is plainly inapposite to the condition at issue.

Under common usage, the condition also did not rise to the level of what Estrella-Jones calls a "toe trap," that is, a change in a surface's elevation that, if struck, can interrupt a person's expected stride and cause them to lose balance. (Tr. 128:18–129:10.) The Court has not found any New York case law that elucidates the notion of a "toe trap." Plaintiff's expert relied on the non-binding American Society for Testing and Materials ("ASTM") standard for "safe walking surfaces."[2] (Pl. Ex. 9.) The ASTM depicts, as an example of a height differential that would render a walking surface unsafe, a figure in which the lower level is directly adjacent to the elevated level, at a ninety degree angle. (Id., fig. 1.) Plaintiff's expert testified, however, that that the "toe trap" in this case materialized over a gradually inclining 2-1/2 inch expanse. (Tr. 127:22–128:10). Moreover, the ASTM standard contemplates that the elevated surface impeding an individual's stride be more elevated than the immediately abutting surface from which the individual stepped. (See Pl. Ex. 9, ¶ 5.2 & fig. 1; Tr. at 327:1–11.) The height differential here, as noted, is the difference between the lowest part of the depression in the asphalt and the 2-1/2 inch-distant edge of the asphalt's un-eroded walking surface. That does not constitute the "abrupt" height differential that both plaintiff's and defendant's experts explained constitutes a tripping hazard based on the ASTM. (Tr. 162:5–15; 339:9–340:12.) The Court therefore concludes that no such "toe trap" existed.

Because the worn condition of the parking lot was trivial and did not have the characteristics of a trap or snare or a "toe trap," it is not actionable. The Court accordingly finds that the United States is not liable for Estrella-Jones's injury.

---

[2] Defendant's expert disputed that the ASTM applies to asphalt parking lots. (Tr. at 326:6–20; 387:2–18.)

**II.     Notice**

Alternatively, even if the condition of the parking lot had been dangerous or nontrivially defective, the United States must have created or had actual or constructive knowledge of that condition for it to be actionable. See, e.g., Lionel v. Target Corp., 44 F. Supp. 3d 315, 319 (E.D.N.Y. 2014). Estrella-Jones does not claim that the United States affirmatively created the condition, nor has she adduced any evidence demonstrating that it actually knew about the condition. The only issue, then, is whether the United States had constructive notice of the condition. The Court concludes that the United States did not.

For a defendant to have constructive notice of a defective condition, "a defect must be visible and apparent and it must exist for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it." Gordon v. Am. Museum of Natural History, 67 N.Y.2d 836, 837 (1986) (citations omitted). A "general awareness" that a dangerous condition "may be present" is insufficient to charge defendant with constructive notice of the specific condition that caused plaintiff's injury. Id. Moreover, "[t]he mere existence of a [dangerous condition] . . . where the accident allegedly took place does not establish constructive notice." Hammond-Warner v. United States, 797 F. Supp. 207, 211 (E.D.N.Y. 1992).

The Court finds that Estrella-Jones has failed to show that the United States had constructive notice of the condition of the parking lot. A preponderance of the evidence does not support concluding that the condition was "visible and apparent." In fact, Estrella-Jones produced no evidence to that effect. Before the accident, Estrella-Jones herself had been to the VA Hospital many times without noticing the condition, (Tr. 69:14–23). See Christian v. United States, 859 F. Supp. 2d 468, 475–76 (E.D.N.Y. 2012) (finding no constructive notice where plaintiff familiar with area had never made prior complaints). Even on the day of the accident, Estrella-Jones did

not notice it until after she fell, (Tr. 46:2–22). See Killeen v. Our Lady of Mercy Med. Ctr., 827 N.Y.S.2d 19, 20 (App. Div. 2006) (finding no constructive notice where "[t]here were no known complaints of a hazardous condition, and even plaintiff had not noticed the [condition] before he fell"). In 13 years of routinely inspecting the parking lot, Officer Rodriguez had not noticed the condition, (Tr. 214:17–19; 260:9–261:2). See Christian, 859 F. Supp. 2d at 475–76 (finding no constructive notice where defendants regularly inspected the premises and observed no dangerous condition, including on the day of the incident). Despite approximately 300 people per day using that entrance, the VA Hospital had never received a report or complaint about the condition, (Tr. 214:17–19; 260:9–261:2; 272:11–14; 278:6–14; 278:23–279:9; 281:21–282:25). See Christian, 859 F. Supp. 2d at 475–76 (finding no constructive notice where there had been no prior complaints); Haleem v. Gold, 164 N.Y.S. 119, 120 (App. Div. 1917) (finding no notice where defendant "had no reason to suppose that [an area] used in safety for so many years could suddenly become a source of danger"). Even given four additional years to deteriorate, the condition was not noticeable in 2015 to Estrella-Jones's own expert, who stated that it was hard to see when walking toward or looking down at it. (Tr. 111:11–112:1; 170:21–22; 200:13–18.) A preponderance of the evidence fails to show the United States constructively knew about the condition of the parking lot. Therefore, the United States is not liable for Estrella-Jones's injury.

## CONCLUSION

For these reasons, the Court finds that Estrella-Jones has failed to carry her burden of demonstrating after trial by a preponderance of the evidence that the United States is liable for her injury. The Clerk of Court is directed to enter judgment for the United States and close the case.

SO ORDERED.

Dated: December 14, 2016
Brooklyn, New York

s/Carol Bagley Amon

Carol Bagley Amon
United States District Judge